UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATASHA LEEANN DENNARD,

      Petitioner,

      v.

MILLICENT WARREN,

      Respondent.[1]
_____/

CASE NO. 2:09-CV-10286
JUDGE BERNARD A. FRIEDMAN
MAGISTRATE JUDGE PAUL J. KOMIVES

**REPORT AND RECOMMENDATION**

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus. The Court should also deny petitioner a certificate of appealability.

II.    REPORT:

A.    *Procedural History*

      1.    Petitioner Natasha Leeann Dennard is a state prisoner, currently confined at the Huron Valley Complex—Women's in Ypsilanti, Michigan.

      2.    On October 24, 2006, petitioner was convicted of involuntary manslaughter, MICH. COMP. LAW § 750.321, following a bench trial in the Wayne County Circuit Court. On November 13, 2006, she was sentenced to a term of 8-15 years' imprisonment.

      3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claim:

      THIS INVALID SENTENCE SHOULD BE CORRECTED BECAUSE THE

---

      [1]By Order entered this date Millicent Warren has been substituted in place of Clarice Stovall as the proper respondent in this action.

COURT WAS UNAWARE OF CRUCIAL FACTS AFFECTING ITS FASHIONING OF THE SENTENCE.

The court of appeals found no merit to petitioner's claim, and affirmed her conviction and sentence. *See People v. Dennard*, No. 275879 (Mich. Ct. App. January 29, 2008).

4. Petitioner then sought leave to appeal this issue to the Michigan Supreme Court. The supreme court denied petitioner's application for leave to appeal in a standard order. *See People v. Dennard*, 481 Mich. 879, 748 N.W.2d 845 (2008).

5. Petitioner filed the instant application for a writ of habeas corpus on January 27, 2009. As grounds for the writ of habeas corpus, she raises the same claim as was brought in the state courts.

6. Respondent filed her answer on August 19, 2009, and contends that petitioner's claim is without merit.

B. *Factual Background Underlying Petitioner's Conviction*

The factual background underlying petitioner's conviction was accurately summarized in the brief filed by respondent in opposition to petitioner's application:

> At trial, the parties stipulated that on July 18, 2006, 28-year-old Larry Dawson was taken to the hospital where he was pronounced dead on arrival (Trial Transcript October 23, 2006, volume I [I], 9-10). The Wayne County Medical Examiner's autopsy report, which was admitted, revealed that Dawson was stabbed twice in the chest. (I, 10). While the first stab wound was superficial, the second went into his right lung and heart. (I, 10). That stab wound traveled upward and left. (I, 10).
> Kenneth Wilson testified that he lived with Petitioner, who was his step-daughter, and Dawson, who was the father of Petitioner's children. (I,12). At 1 A.M. that morning, Petitioner, Dawson, Wilson and Petitioner's mother Robinette were awake while the children in the house were sleeping. (I, 12-14). Wilson and Robinette were in their first-floor bedroom watching television. (I, 14). Robinette opened their bedroom door and Wilson heard Petitioner and Dawson arguing. (I, 14-15). Robinette left the bedroom, closing the door behind her. (I, 16, 39).
> Wilson then heard Robinette yelling at Petitioner to stop and then yelling at

Petitioner and Dawson to stop. (I, 20-21, 39). Wilson did not recall telling the police that Robinette yelled Petitioner's name and then asked Petitioner to give her a knife or put down the knife. (I, 22, 57). Wilson claimed that he could only remember Robinette saying: "let go, let go." (I, 55). Petitioner was telling Dawson "to let her go." (I, 55). Dawson wasn't talking. (I, 55).

In any event, Wilson got up and went toward the kitchen. (I, 20). Robinette, Petitioner, and Dawson were blocking one of the entry ways [sic]. (I, 23-25, 58-59, 62). Dawson was holding Petitioner's arm with one hand and her shoulder/neck area with the other, choking her. (I, 25-26, 54-55, 58-59). Petitioner had a knife. (I, 27-28, 40). The knife was from a knife rack about six feet away from the stove. (I, 43). However, the knife rack was closer to the doorway where Petitioner and Dawson were initially standing. (I, 60-62).

By the time Wilson made his way around to the other entrance to the kitchen, Robinette had Petitioner's wrist. (I, 26-27, 62). Wilson grabbed Petitioner's arm and Dawson's arm. (I, 26-27, 62). Dawson was also holding Petitioner's arm to keep the knife away. (I, 42). Both Robinette and Wilson were attempting to pull Petitioner and Dawson apart. (I, 27). Dawson had Petitioner bent over the stove, keeping her at bay. (I, 40-42, 45, 49, 62). Wilson got Petitioner to hold the knife blade down. (I, 32-34). Wilson managed to break Dawson's grip on Petitioner's arm and pull Dawson away. (I, 28, 44, 47, 51).

Wilson told Dawson to go outside. (I, 28, 44, 51, 53). Dawson who was taller than Petitioner, reached over Wilson and struck Petitioner in the upper chest or face with his fist. (I, 28, 34-35, 48-49, 53). Wilson pushed Dawson back. (I, 29, 51).

Dawson then went to the porch and sat down. (I, 29). Petitioner went upstairs and the kitchen knife was on the stove. (I, 30-31, 54). Wilson denied that there was any blood on the knife and did not know why the knife was found elsewhere. (I, 32, 54).

Wilson went out onto the porch and observed blood on the porch, which Dawson had coughed up. (I, 33). Wilson's neighbor had already called 911, but Wilson did so as well. (I, 33,35). Dawson was saying he couldn't breathe and had bled on himself. (I, 56).

Wilson was directed to get Dawson back into the house and apply pressure to this wound. (I, 33,35). Wilson did not know how Dawson had been stabbed. (I, 32).

Wilson did as directed. (I, 36). Petitioner kneeled over Dawson and Wilson heard them saying "they were sorry." (I, 37-38). Wilson claimed that at that time, he saw "like a hand print" on Petitioner's neck and noticed the lower part of her face was red. (I, 41). Dawson stated that he loved Petitioner and wanted to see his children. (I, 37). The police came and an ambulance took Dawson to the hospital. (I, 36).

A photograph of the kitchen was admitted. (I, 56-57, 88-89).

Robinette testified that Dawson lived with Petitioner and that they had an on-going relationship. (I, 64). Robinette confirmed that she and Wilson had been watching television when she heard "tussling in the kitchen." (I, 65). Robinette got

3

up to see what was wrong. (I, 66). Robinette denied hearing any arguing. (I, 66).

Robinette saw Dawson choking Petitioner. (I, 67, 75). According to Robinette, both Dawson and Petitioner "had their hand on the knife." (I, 67-68, 70, 79-80). Robinette described the knife as a butcher knife. (I, 68). Petitioner was asking Dawson to let her go. (I, 79, 81).

Robinette attempted to intercede and called for Wilson. (I, 67). Wilson arrived and tried to pull Petitioner and Dawson apart. (I, 68). The knife dropped to the floor. (I, 68-69, 76-77). Robinette picked up the knife and put in the kitchen sink. (I, 72, 80).

As Wilson pulled Petitioner back, Dawson beat Petitioner in the face and kicked her in the stomach. (I, 68-69, 76-79).

Robinette told Dawson: "Larry leave her alone. We got her off from [sic] away from you, so go on the front porch." (I, 68). Robinette was pulling on Dawson as well. (I, 69).

Petitioner went upstairs. (I, 73).

Robinette accompanied Dawson to the porch, where he sat down. (I, 69-70). Dawson then began to cough. (I, 69-71). Robinette asked what was wrong. (I, 69). Dawson stated that he didn't know, but that he couldn't breathe. (I, 69-70). Dawson then coughed up blood. (I, 69, 71).

Robinette called to Wilson and told him to call 911. (I, 71).

Robinette called Petitioner, telling her that Dawson was hurt. (I, 73). Petitioner came down the stairs and said: "Larry, I'm sorry. I didn't know you was hurt." (I, 73). According to Robinette, Dawson hugged and kissed Petitioner and told her to come to the hospital with him. (I, 73).

Petitioner left. (I, 73-74).

Robinette denied seeing anyone stab Dawson. (I, 69).

Robinette could not explain how the knife got into the slit between the refrigerator door's handles. (I, 72).

Robinette admitted that she wrote a two-page statement for the police and did not state that Dawson was choking Petitioner. (I, 74-75).

Detroit Police Officer Latonya Brooks testified that she interviewed Petitioner at 5:20 p.m. on July 18, 2006. (I, 82-84). Petitioner's statement was admitted and read:

Q: Can you tell me what happened between you and Larry Dawson on 7-18-06 at 3:00 a.m.?
A: We got into a fight. He choked me and he hit me in the mouth. He slammed me against the wall. I didn't know I stabbed him. It was permanently [sic] done. It was an accident. I grabbed the knife from the refrigerator. It was the first thing I saw.
Q: What were you and Larry fighting about?
A: Because I don't know. Over some stuff, him being a liar. That he is stupid. Baby drama stuff.
Q: Where did you stab him at?
A: I don't know. I didn't even know I stabbed him. I stayed with

>>him. I hid because I didn't want to go to jail.
>>Q: Did your family members try to take the knife from you?
>>A: Yes. My momma did take it from me.
>>Q: When did you realize that you had stabbed Larry?
>>A: When I went upstairs I heard my mother screaming. I told her that I didn't mean to do it. They said he was coughing up blood.
>>Q: Are all three of your children by Larry?
>>A: Just two, the two girls.
>>Q: Did you know where you stabbed him (on his body)?
>>A: He was lying on his right side, so it had to be his left side.
>>Q: Did you see blood on him?
>>A: Yes. I had blood on me too.
>>Q: Is there anything else you want me to know?
>>A: Yes. I don't want to do any time. I don't want to go to jail. That was self-defense.
>>Q: Did Larry have any weapons?
>>A: No, I don't think so.
>
>(I, 86-88). When Brooks interviewed Petitioner, Petitioner showed Brooks her bottom lip. (I, 88).
>  The evidence technician's report and the crime scene photographs were admitted. (I, 88-89).
>  Petitioner elected not to testify. (I, 93-94).
>  The trial court convicted her of involuntary manslaughter, rejecting theories that the stabbing was accidental or undertaken in self-defense. (Trial Transcript dated October 24, 2006, volume II [II], 4-13).
>  Petitioner had previously been convicted of attempted felonious assault for trying to stab Dawson. (Sentencing Transcript dated November 13, 2006 [S], 7).
>  At sentencing, Dawson's mother stated that Petitioner had tried to kill Dawson five years earlier. (S, 18). Likewise, Dawson's sister stated that Petitioner was violent toward Dawson, but that Dawson never hurt Petitioner. (S, 23-24).

Answer, at 2-6

C.   *Standard of Review*

Because petitioner's application was filed after April 24, 1996, her petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

5

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also, Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams,* 529 U.S. at 405-06); *see also, Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); see also, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); see also, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, 537 U.S. at 8; see also, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. See *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.   *Validity of Petitioner's Prison Sentence*

    1.   *Clearly Established Law*

A habeas petitioner's claim that the trial court violated state law when sentencing her is not

cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4F.3d 1348, 1354 (6th Cir. 1993).

There are four generally recognized purposes of criminal sanctions, and imprisonment in particular: rehabilitation, deterrence, incapacitation, and retribution (*i.e.* punishment. *See generally, United States v. Brown*, 381 U.S. 437, 458 (1965); *Trop v. Dulles*, 356 U.S. 86, 111 (1958) (Brennan, J., concurring); Toni M. Massaro, *Shame, Culture, and American Criminal Law*, 89 MICH. L. REV. 1880, 1890 (1991). However, nothing in the Constitution requires a state to establish its system of criminal sanctions to give primacy to any one of these goals. *See Harmelin v. Michigan*, 501 U.S. 957, 999 (Kennedy, J.) ("[T]he Eighth Amendment does not mandate adoption of any one penological theory."). Thus, so long as the imprisonment is not cruel and unusual under the Eighth Amendment and does not violate some other constitutional guarantee such as the Equal Protection Clause, a state is free to impose imprisonment solely for the purpose of punishment. *Cf. Furman v. Georgia*, 408 U.S. 238, 308 (1972) (Stewart, J., concurring) ("The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law.").

Similarly, petitioner's claim that the trial court failed to impose an individualized sentence is not a constitutional claim that is cognizable on habeas review. Although the Supreme Court has held that individualized sentencing is required in the death penalty context, *see, e.g., Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), these

cases "have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties." *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citing *Eddings v. Oklahoma*, 455 U.S. 104 110-112 (1982); *Rummel v. Estelle*, 445 U.S. 263, 272 (1980); *Lockett v. Ohio*, 438 U.S. 586, 602-05 (1978); *Woodson*, 428 U.S. at 303-05). Based on these cases, the *Harmelin* Court explicitly declined to extend the individualized sentencing requirement to non-capital cases. *Harmelin*, 501 U.S. at 996 ("We have drawn the line or required individualized sentencing at capital cases, and see no basis for extending it further."); *see also, id*. at 1006 (Kennedy, J., concurring).

2. *Analysis*

Petitioner contends that her sentence is invalid because the sentencing court was unaware of crucial facts that should have affected its fashioning of the sentence. Petitioner believes that the complete circumstances surrounding the death of Mr. Dawson were not properly portrayed to the sentencing court.

Under MCL 769.34(10), a sentence absent an error in scoring the sentencing guidelines and that properly relies on accurate information in determining the defendant's sentence is valid and should be upheld. Petitioner is not alleging any scoring error, but does believe the sentencing court relied on inaccurate information in making its determination. Petitioner contends that the sentencing court was not fully aware of her fear and the danger that she faced during the incident with Mr. Dawson. However, there is sufficient evidence to suggest that the court was fully aware that Mr. Dawson had choked and hit petitioner prior to being stabbed. Trial Tr., Vol., 25-26, 28, 34, 35, 41, 48-49, 53-55, 58-59, 65, 67-69, 74-79, 81, 86; Sentence Tr., at 13-15. The sentencing court was also informed of petitioner's claim that Mr. Dawson had assaulted her on previous occasions. Because

petitioner has not shown that the sentencing court actually relied on inaccurate information, her sentencing decision was valid.

Additionally, as a part of her claim that the sentence was invalid, petitioner asserts that the sentence was not individualized to her situation. While it is possible that the court failed to individualize petitioner's sentence, this point of controversy is irrelevant. As explained in *Harmelin*, individualized sentences are only mandated in capital cases. Because petitioner's sentence did not include capital punishment, it was not necessary that her sentencing be individualized. *Harmelin*, 501 U.S. at 996. Petitioner's sentence was within the sentencing guidelines that pertain to an involuntary manslaughter charge and as such is completely valid.

E.  *Recommendation Regarding Certificate of Appealability*

    1.  *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. See 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); accord *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never

issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); accord *Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); see id., advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2. *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claim, the Court should conclude that petitioner is not entitled to a certificate of appealability. Petitioner was unable to show that the sentencing court based its decision on incomplete or inaccurate information. Beyond this, petitioner's claim that the court failed to individualize her sentence is irrelevant in a noncapital case. As such, the conclusion that petitioner's sentence was determined properly is not reasonably debatable. Further, it is clear under established Supreme Court precedent that petitioner's sentencing claim is not cognizable on habeas review, and thus the resolution of this claim is not reasonably debatable. Accordingly the Court should conclude that petitioner is not entitled to a certificate of appealability.

F.  *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.  NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the

objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 7/14/10

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on July 14, 2010.
>
> s/Eddrey Butts
> Case Manager